# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DAVID E. DUNDR, | ) | CASE NO:     1:07-cv-00463 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | NANCY A. VECCHIARELLI |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **MEMORANDUM OPINION &** |
| Commissioner of Social Security, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff David E. Dundr ("Dundr") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Dundr's claim for Disability Insurance Benefits ("DIB") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is **AFFIRMED.**

## I.  Procedural History

On February 25, 1999, Dundr filed an application for DIB, alleging a disability onset date of August 12, 1998.  (Tr. 155-58.)  After his application was denied initially and on reconsideration, Dundr requested an administrative hearing.  (Tr. 135-36.)  On March 10, 2000, Administrative Law Judge, Leonard A. Nelson ("ALJ Nelson"), held a hearing during which a medical expert, a vocational expert, and Dundr, represented by counsel, testified.  (Tr. 54-74.)  In a decision dated March 28, 2000, ALJ Nelson found that Dundr could perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 110-11.)

On October 4, 2000, the Appeals Council vacated the decision and issued a "Notice of Order Remanding Case to Administrative Law Judge" on the ground that ALJ Nelson did not find that Dundr's mental health impairment was a severe impairment.  (Tr. 145.)  The Appeals Council "note[d] that the uncontroverted medical evidence of record indicate[ed] that" Dundr's mental impairments may have been severe and concluded that "additional evidence and evaluation [was] necessary."  (*Id*.)  The Appeals Council ordered the next administrative law judge to do the following upon remand: (1) "[o]btain additional evidence concerning the claimant's mental impairments . . . ."; (2) [f]urther evaluate the claimant's mental impairments in accordance with the special technique described in 20 C.F.R. 404.1520(a) . . . ."; and (3) "[i]f warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base . . . ." (*Id*.)

On remand, Administrative Law Judge, David B. Washington ("ALJ Washington") held a hearing at which a medical expert, vocational expert, and Dundr, represented by counsel, testified.  (Tr. 75-97.)  In a decision dated March 30, 2001, ALJ Washington found that Dundr had no severe mental impairments.  (Tr. 31.)  ALJ Washington concluded that Dundr could perform a significant number of jobs in the national economy and, therefore, was not disabled. (Tr. 31-32.)  ALJ Washington's decision became the final decision of the Commissioner when the Appeals Council denied further review.  (Tr. 14, 15 22.)

Dundr filed a complaint in federal court, seeking judicial review pursuant to 42 U.S.C. § 405(g) and 1383(c).  (*See* Tr. 603-09.)  The magistrate judge to whom the case was referred found that the hearing did not comport with the Appeals Council's order of remand.  (Tr. 609.) Adopting the report and recommendation of the magistrate judge, the district court issued an

2

order setting aside the decision and remanded the matter for further proceedings in conformity with the Appeals Council's order of remand.  (Tr. 603-09.)

While Dundr's claim was pending in federal court, he filed a new application for DIB on August 3, 2001.  (Tr. 812-15.)  The new case was combined with the remanded case and was assigned to Administrative Law Judge, Morley White ("the ALJ").  (*See* Tr. 498-567.)  On April 28, 2004, a third hearing was held at which a medical expert, Frank Cox, M.D., vocational expert, Barbara Burk, and Dundr, represented by counsel, testified.  (*Id*.)  During the hearing, the ALJ determined that there was a need for testimony from a medical expert specializing in psychiatry; therefore, he held a supplemental hearing on July 28, 2004, at which psychiatric medical expert, Daniel Shweid, M.D. testified.  (Tr. 568-602.)  Vocational expert, Carol Mosley, and Dundr also testified at the supplemental hearing.  (*Id*.)  On December 11, 2004, the ALJ issued a decision concluding that Dundr had severe mental impairments, but could nonetheless perform a significant number of jobs in the national economy and, therefore, was not disabled. (Tr. 469-77.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.  (Tr. 457-59, 463-64.)

On July 6, 2007, Dundr filed a complaint in this Court, seeking judicial review pursuant to 42 U.S.C. § 405(g) and 1383(c).  (Doc. No. 1.)  On appeal, Dundr claims the ALJ committed the following errors:  1) the ALJ erred in failing to give proper consideration to the Plaintiff's complaints of fatigue and, thus, the opinion of his treating physician; and 2) the ALJ's determination that the Plaintiff could perform a reduced range of light work activity is not supported by substantial evidence.  (Doc. No. 17, Plaintiff's Brief at 14, 17.)

## II.  Evidence

3

***Personal and Vocational Evidence***

Born on December 22, 1950, Dundr was considered a younger individual at the time of his disability onset date (August 12, 1998) and an individual closely approaching advanced age when his disability insurance status ended on December 31, 2003.  (Tr. 156.)  Dundr completed the 12th grade.  (Tr. 186, 835.)  238.)  Dundr has past relevant work experience as a truck driver, which is heavy and semi-skilled work, and as a driller, which is very heavy and semi-skilled work.  (Tr. 1041.)

***Medical Evidence***

Dundr has a history of back pain since at least September 1995 (Tr. 241-54, 259) and hypertension since at least 1988 (Tr. 242, 259).  On August 7, 1998, Dundr told Chris Young, M.D. of the Center for Family Medicine that he had occasional low back pain that was stable for the past 15 years and was worse upon awakening but resolved during the morning.  (Tr. 258.)  Dundr's blood pressure was 142/68; other examination findings were essentially normal.  (*Id*.)

During an examination at a VA facility ("the VA") on September 15, 1998, Dundr complained of low back pain and stiffness and stated that he could not bend or lift anything heavy.  (Tr. 241.)  An examination revealed tenderness over the lumbosacral spine, spasms of the paravertebral muscle, decreased range of motion, and positive straight leg raises bilaterally to 30 degrees.  (*Id*.)  The physician diagnosed thoracic and lumbar myofacitis and lumbosacral strain.  (*Id*.)

Medical records from the VA dated December 10, 1998 through April 1, 1999 reveal that Dundr consistently complained of  fatigue.  (Tr. 261-62, 267, 277, 314, 378-79.)  Dundr also had complaints of lower extremity edema and trouble sleeping.  (Tr. 314, 316, 376.)

4

From January 22, 1999 through October 14, 1999, Dundr complained of knee and back pain.  (Tr. 264, 271, 274, 281, 335, 378, 392.)  He had chronic mild swelling of the left knee. (Tr. 274.)  On February 17, 1999, a grind test of the left knee was positive.  (Tr. 271.)  Dundr was diagnosed with degenerative joint disease of the left knee.  (Tr. 280.)  On March 17, 1999, after attending kinesiology therapy for four weeks, Dundr no longer had constant knee pain and his leg strength had improved.  (Tr. 264.)

An MRI of the lumbar spine on March 5, 1999 revealed mild degenerative disc disease at L5-S1.  (Tr. 293.)

On April 5, 1999, at the request of the state agency, Dundr was evaluated by psychologist, Herschel J. Pickholtz.  During the consultative examination, Dundr stated that he was disabled due to problems with his back and high blood pressure.  (Tr. 322.)  He reported that he had difficulties falling asleep, was not very happy, and had difficulties as a consequence of thinking about all the things he had done wrong.  (Tr. 323.)  According to Dr. Pickholtz's report, Dundr's daily activities were as follows.  Dundr arose anywhere between 7:00 a.m. and 12:00 p.m., but usually between 7:00 and 8:00 a.m. and went for a 40 minute walk in the park.  (Tr. 323-24.) After his walk, he attended physical therapy for about two hours.  He drove to AA meetings daily and tried to read the "Big Book," although his vision sometimes got blurry.  (Tr. 324.)  "In the afternoons, he [kept] busy."  (*Id*.)  He went to the VA in Brecksville every day to talk to people and attend AA meetings.  (*Id*.)  Sometimes, he napped for about one hour in the afternoon.  (*Id*.)  In the evenings, he attended AA or NA meetings, then watched television.  (*Id*.) He visited his mother on a fairly regular basis, read the daily newspaper, and went to church regularly.  (*Id*.)

5

With respect to household chores, Dundr went grocery shopping once a week and cooked dinner for himself; he usually began cooking by 3:00 or 4:00 p.m. and thought "he [was] still a decent cook." (*Id.*)  In addition to cooking for himself, Dundr vacuumed, swept, and mopped twice a week and did his own laundry.  (*Id.*)

Dr. Pickholtz noted that Dundr's affect appeared to be somewhat depressed and Dundr complained of depression secondary to his current physical problems and being unable to take care of himself.  (Tr. 324.)  Dr. Pickholtz diagnosed mixed polysubstance dependence, allegedly in remission since 1985, alcohol dependence, allegedly in remission as of six months ago, adjustment disorder with depressed mood secondary to sobriety and his physical limitations and complaints, and mixed personality involving narcissistic and addictive features and tendencies toward exaggeration.  (Tr. 327.)  Dr. Pickholtz opined that Dundr had mild limitations in most areas except for his ability to handle the stresses and pressures associated with low skilled and unskilled labor from a psychological perspective, which Dr. Pickholtz opined fell within the mild to moderate range of impairment.  (Tr. 327-328.)

Dundr was hospitalized at the VA from April 11 through April 18, 1999 due to a history of hypertension, polydipsia, polyuria, increased weakness and fatigue, increased facial hair, elevated blood sugar, blurry vision, and progressively worsening hypokalemia with increased facial flushing and confusion.  (Tr. 339.)  Dundr was admitted to complete laboratory studies and check for a secondary reason for his hypertension.  He reported increased frequency of headaches, more irritability, restlessness, easy fatiguability, and weakness.  (Tr. 341, 344.)  Lab work revealed increased potassium and, at times, decreased potassium, increased protein, and aldosterone.  (Tr. 348, 349, 355, 356, 358-363, 365.)  In

6

September 1999, Dr. Falconi at the VA diagnosed Dundr with Conn's syndrome.[1]  (Tr. 379, 395, 401.)

Treatment notes from Otto Kausch, M.D., dated August 24, 1999, indicate the following. Dundr had previously presented to Dr. Kausch complaining of anxiety and sleep problems; Dr. Kausch prescribed  hydroxyzine[2] and trazodone.[3]  (Tr. 376.)  Dundr now complained that the trazodone no longer helped him sleep, and that he woke up hung over.  (*Id.*)  Dundr also complained that the hydroxyzine did not help.  However, Dr. Kausch noted that despite Dundr's complaint,  Dundr "look[ed] very calm and comfortable in [his] office."  (*Id.*)  On September 22, 1999, Dundr complained to Dr. Kausch that he was still having trouble falling asleep, felt tired during the day and almost fell asleep while driving.  (Tr. 398.)  Dr. Kausch warned Dundr that Benadryl, which he was taking three times a day, has a sedating effect.  (*Id.*)

Medical records from the VA from January 20, 2000 through October 19, 2000 documented continuing complaints of fatigue (Tr. 404, 411, 425, 428, 454), as well as knee and low back pain (Tr. 411, 421, 423, 426, 452, 454).  Dundr had decreased range of motion of the

---

[1]Conn's Syndrome, also called "primary aldosteronism," is caused by "an adenoma, usually unilateral, of the glomulerosa cells of the adrenal cortex or, more rarely, to an adrenal carcinoma or hyperplasia."  *The Merck Manual*, 109-110 (Mark H. Beers, M.D. & Robert Berkow, M.D. eds., 7th ed. 1999).  Aldosteronism is the clinical syndrome resulting from excess aldosterone secretion.  *Id.*

[2]Hydroxyzine is used to treat "symptomatic relief of anxiety and tension associated with psychoneurosis and as an adjunct in organic disease states in which anxiety is manifested."  Drowsiness is a side effect of hydroxyzine, but is "usually transitory and may disappear in a few days of continued therapy or upon reduction of the dose."  *See* http://rxlist.com/cgi/generic/vistaril_ids.htm (last visited July 25, 2008).

[3]Trazodone is an anti depressant, the most common side effect of which is drowsiness. *See* http://rxlist.com/cgi/generic/traz_pt.htm (last visited July 25, 2008).

low back (Tr. 427) and lower extremity edema (Tr. 416).  He also had muscle cramps in his calves and his shoulders intermittently.  (Tr. 415, 417, 432.)  As of February 23, 2000, Dundr's medications included the following:  metoprolol tartrate, nifedipine, lisinopril, simvastatin, gemfibrozil, potassium chloride, psyllium oral powder, ranitidine HCL, naproxen, spironolactone, desipramine, diphenhydramine (Benadryl), folic acid, acetaminophen, and a multivitamin with minerals.  (Tr. 229-230.)

An X-ray of the left knee taken on June 15, 2000 revealed mild degenerative changes involving the lateral aspect of the knee.  (Tr. 431.)  An MRI of the right knee on August 25, 2000 revealed a bone bruise involving the lateral femoral condyle.  (Tr. 430.)  An x-ray of the lumbar spine on October 13, 2000 revealed degenerative changes involving L2, L3, L4, L5 and S1.  (Tr. 429.)

Medical records in 2001 revealed continuing complaints of fatigue, (Tr. 441, 924, 933, 939, 940, 947, 958), low back pain (Tr. 441, 919, 921, 929, 933, 961, 1020), knee pain (Tr. 921), and trouble sleeping (Tr. 445, 450, 929, 903).  A pain clinic assessment indicates that Dundr's back pain was exacerbated by bending, lifting, walking and twisting, and could be exacerbated by the weather.  (Tr. 930.)  An x-ray of the cervical spine on June 13, 2001 revealed degenerative changes at C4-C6.  (Tr. 911.)

An x-ray of the left knee on September 11, 2001 revealed mild degenerative joint disease.  (Tr. 905.)  On November 26, 2001, Dundr underwent an x-ray of the lumbar spine which revealed mild degenerative changes.  (Tr. 915, 1021.)  A CT scan of the lumbar spine taken on December 15, 2001 revealed a disc herniation at L4-L5 on the left side and mild central disc bulging at L5-S1.  (Tr. 700.)

8

Medical records from the VA Hospital in 2002 reflect continuing complaints of back pain, (Tr. 983, 998, 1000, 1009, 1012, 1015, 1031), knee pain (Tr. 987, 999, 1012), foot pain (Tr. 983, 987), edema in the ankles (Tr. 987), excessive sleep (Tr. 991), and fatigue (Tr. 1016).

A CT scan of the lumbosacral spine taken on January 9, 2002, revealed a herniated disk at L4-L5 on the left side and mild central disk bulging at L5-S1.  (Tr. 1018.)  Notes from Dr. Eric Frederickson at the pain clinic, dated February 15, 2002, indicate that Dundr was "not interested in an orthopedic consult."  (Tr. 1018.)  Dr. Fredrickson increased Dundr's dosage of gabapentin from 300 to 500 milligrams and prescribed a limited supply of Percocet[4] for Dundr's chronic back pain.

On March 13, 2002, Dundr told Dr. Frederickson that Percocet significantly reduced his back pain.  (Tr. 1000, 1009.)  On April 11, 2002, Dundr reported getting adequate relief of his back pain, but he complained of swelling and pain in his left knee.  (Tr. 999.)  On July 11, 2002, Dundr reported that his back pain was controlled on medication, but he had pain in his knees and his feet.  (Tr. 987.)  Dr. Fredrickson prescribed more Percocet.  (Tr. 987.)  On September 9, 2002, Dundr requested a higher dosage of Percocet, but his prescription was renewed at the existing dosage.  (Tr. 1031.)  Dundr was walking sporadically for exercise and using a TENS unit; he reported that his pain was tolerable.  (*Id*.)

A medication list received at the hearing office on December 5, 2002, indicated that

---

[4]Percocet is a combination of oxycodone (an opioid analgesic) and acetaminophen.  It is indicated for relief or moderate to moderately severe pain.  The most frequently observed non-serious side-effects of Percocet include drowsiness or sedation.  *See* http://rxlist.com/cgi/generic/oxyapap_ad.htm (last visited July 25, 2008).

Dundr was on the following medications: oxycodone HCL,[5] guifenesin, spironolactone, lisinopril, nifedipine, simvastatin, folic acid, potassium chloride, acetaminophen, metoprolol tantrate, psyllium oral, rabeprazole, choline magnesium trisalicylate, fexofenadine,[6] albuterol aerosol, multivitamin with minerals, mirtazapine,[7] sodium chloride, nasarel nasal spray, amitriptyline,[8] and gabapentin.[9]  (Tr. 867.)

Medical records in 2003 revealed that Dundr complained of low back, knee, and shoulder pain.  (Tr. 625, 628, 717.)  During a visit to the pain clinic on June 5, 2003, Dundr reported that an increase in the dosage of his Neurontin seemed to help his pain.  Jaqueline E. Ellis, R.N., a nurse at the pain clinic advised Dundr to exercise regularly and taper the Percocet by taking it only in the morning.  (Tr. 628.)

In a letter to the Social Security Administration ("SSA"), dated June 19, 2003, Dr. Campbell indicated that Dundr had been under her care for several years.  (Tr. 621.)  Dr.

---

[5]Oxycodone HCL (generic for OxyContin) is an opioid analgesic indicated for treatment of moderate to severe chronic pain.  Somnolence is one of the most frequent side effects of oxycodone.  *See* http://rxlist.com/cgi/generic/oxycontin_ad.htm (last visited July 25, 2008).

[6]Fexofenadine is an antihistamin.  Its possible a side effects include somnolence and fatigue.  *See* http://rxlist.com/cgi/generic/fexofen_ad.htm (last visited July 25, 2008).

[7]Mirtazapine is an antidepressant indicated for treatment of major depressive disorders. The most common side-effect of mirtazapine is somnolence.  *See* http://rxlist.com/cgi/generic/mirtaz_ad.htm (last visited July 25, 2008).

[8]Amitriptyline is "an antidepressant with sedative effects."  Its side effects include drowsiness, weakness, and fatigue. *See* http://rxlist.com/cgi/generic/amitrip_ad.htm (last visited July 25, 2008).

[9]Gabapentin (generic for Neurontin) is indicated for treatment of postherpetic neuralgia and epilepsy.  A common side effect of gabapentin is somnolence.  *See* http://rxlist.com/cgi/generic/gabapent_ad.htm (last visited July 25, 2008).

10

Campbell diagnosed a recurrent mood disorder which was secondary to Dundr's multiple medical problems, and indicated that Dundr was taking 22 medications, 21 of which were for treating his medical problems.  (*Id.*)  Dr. Campbell opined that Dundr was "disabled" due to the multiple side effects from his medication, the most prominent of which was "excessive daytime sedation" which impacted his cognitive functioning.  (*Id.*)

On June 30, 2003, in a letter to the SSA, Stan Marvin, a physician assistant, stated the following.  Dundr was taking 21 medications on a daily basis.  (Tr. 620.)  Dundr had severe osteoarthritis with degeneration of his major joints, as well as spinal disc herniation.  (*Id.*)  Dundr could not walk, sit, or stand for "prolonged periods" of time and "required constant pain medication."  (*Id.*)  In addition, Dundr was being treated at "Outpatient Mental Health" for mood disorder, panic and/or anxiety.  (*Id.*)

In a letter to the SSA dated August 5, 2003, Dr. Fredrickson stated the following.  He had been treating Dundr for two years for severe osteoarthritis of the knees and low back.  (Tr. 622.)  Dundr's pain was being treated with Percocet, Vioxx, amitriptyline, and capsaicin cream.  (*Id.*)  Dr. Frederickson opined that although Dundr was being treated for multiple other medical conditions, the oseoarthritis alone rendered Dundr unemployable.  (*Id.*)

On September 16, 2003, an MRI of Dundr's left knee revealed degenerative change involving the meniscus.  (Tr. 636.)

A printout of the Dundr's medications on January 13, 2004 revealed that he had been prescribed the following medications: choline magnesium trisalicylate, zolpidem tartrate,[10]

---

[10]Zolpidam tartrate (generic for Ambien) is a sleeping pill indicated for the short-term treatment of insomnia.  Drowsiness is a common side effect of zolpidam tartrate.  *See* http://rxlist.com/cgi/generic/zolpid_ids.htm (last visited July 25, 2008).

11

gabapentin, topiramate, amitriptyline, fluoxetine HCL, mirtazapine, metoprolol, nifedipine, simvastatin, spironolactone, lisinopril, capsaicin cream, psyllium, rabeprazole, sildenafil citrate, hyaluronate sodium, flunisolide, sodium chloride, hydrocor, albuterol, potassium chloride, folic acid, and multivitamin.  (Tr. 631-635.)

In January 2004, Dundr underwent a series of injections in his left knee, but they did not relieve his pain.  (Tr. 706-11.)  On January 6, 2004, rheumatology resident, Paul E. Drawz, M.D. noted that Dundr's range of motion and strength were good in both knees.  (Tr. 712.)  On January 27, 2004, Johhny G. Su, M.D., noted that Dundr took Vioxx and Percocet for pain relief, but experienced only mild relief.  (Tr. 706.)  On two occasions in January 2004, Dundr sought treatment at Fairview Hospital for his low back pain; each time, Dundr was prescribed Percocet. (Tr. 730-31.)

An x-ray of the cervical spine taken on February 17, 2004 showed mild cervical spondylosis.  (Tr. 643.)

Progress notes from the VA hospital from February to June 2004 indicate that Dundr continued to complain that his medications made him very sleepy which prevented him from working and participating in many of his activities of daily living.  (Tr. 696, 740, 743-44, 746, 751-52, 754.)  In addition to the left knee pain, Dundr continued to complain of back pain.  (Tr. 698, 701, 706, 708, 709, 712.)  On February 2, 2004, Dundr complained that he was not sleeping well and that Percocet was not really helping his back and knee pain, but an analgesic balm was helpful.  (Tr. 703.)

Progress notes from rheumatologist, Mathilde H. Pioro, M.D. dated February 2, 2004,

---

indicate the following.  Dundr told Dr. Pioro that he performed all domestic chores, such as laundry and grocery shopping.  (Tr. 698.)  "When asked what he does during the day, [Dundr was] defensive and vague."  (*Id*.)  Dundr stated that he exercised "for hours with his Boflex machine," but later stated that he had not exercised for two months because he "got angry with the pain clinic" and because "they won't give me social security unless I'm overweight."  (*Id*.) Dundr also told Dr. Pioro that he walked over eight hours a day when the weather was good, but he could not indicate when the last time he did that was.  (*Id*.)  Dr. Pioro repeatedly asked how much Dundr exercised, but Dundr "refused to answer, saying he wouldn't tell [her] 'because of social security.'"  (*Id*.)  Dundr asked Dr. Pioro to refill his Percocet five times.  (Tr. 699.) However, throughout the interview, Dundr made the following inconsistent statements about the efficacy of the Percocet: "It doesn't work."  "It's the only thing that works."  "It never does anything."  "It's not strong enough.  Can you refill it?'"  Dundr also stated "I don't want Percocet.  It's not about the Percocet, it's about the social security."  (*Id*.)

Based on imaging of Dundr's left knee and lumbar spine, as well as on examination,  Dr. Pioro's overall impressions were (1) "Chronic left knee pain – very mild OA of the left knee; also a small knee effusion on exam which suggests very early inflammatory cartilage changes. Patient does not have any features to suggest severe OA of the left knee"; (2) "Chronic low back pain without a focal neuro deficit.  Sensory changes have no clear cut anatomical correlate"; and (3) "There is a discrepancy between the patients numerous subjective complaints and the paucity of objective abnormalities on exam."  (Tr. 701.)  Dr. Pioro recommended conservative management and opined that the findings on physical examination and imaging studies "do not warrant the use of chronic opioids."  (*Id*.)  She further noted, "I do not think this patient is

13

disabled from a musculoskeletal point of view."  (*Id.*)

On February 24, 2004, Dundr had a pain management follow-up with Kenneth Moss, M.D.  (Tr. 696.)  Dr. Moss's notes reveal the following.  Dundr reported that the Percocet did not help him and that he became very sleepy on his medications.  (*Id.*)  When Dr. Moss told Dundr that pain medication would add to his sedation, Dundr said it was "OK."  (*Id.*)  When Dr. Moss then told Dundr that he did not believe there was any indication for pain medication,  Dundr "became enraged and stormed out," and "his parting words were a string of expletives."  (*Id.*) Dr. Moss opined that Dundr should not be given any opiates for his pain for the following reasons: (1) Dundr displayed some addictive traits such as drug seeking behavior and defense of his medication without a clear indication; (2) Dundr had not demonstrated any improvement in function such as returning to work or increasing activity; (3) the medication was ineffective by Dundr's own admission; and (4) Dundr's pain "was well beyond what would be expected based on the anatomical reasons."  (*Id.*)

Dundr was hospitalized at the VA hospital from February 26, 2004 to March 15, 2004. (Tr. 661, 760.)  Dundr's symptoms included mania, pressured and loud speech, irritability, difficulty sleeping, confusion at times, and he was noted to be intrusive and overbearing.  (Tr. 665, 666, 670, 673, 681, 684, 686, 694.)  Dundr was diagnosed with Bipolar I and alcohol dependence in full remission.  (Tr. 673.)  At discharge his affect was expansive and animated, his thought process was tangential and circumstantial, and he was found to have poor insight as he did not recognize his manic behavior.  (Tr. 763).  Afterward, Dundr was depressed, anxious, and over-talkative.  (Tr. 740-741, 757, 758.)

On April 27, 2004, Dr. Elbadawy completed a medical source statement on Dundr's

14

residual functional capacity.  (Tr. 1037-38.)  Dr. Elbadawy opined that Dundr could lift 10

pounds both frequently and occasionally and stand 4 hours total in an 8 hour day and only 2

hours at a time.  (Tr. 1037.)  As "medical findings" in support of these limitations, Dr. Elbadawy

cited "chronic back pain" and "osteoarthritis," but did not cite to specific test results or

examination findings.  (*Id*.)  Dr. Elbadawy indicated that Dundr was prescribed a cane, a brace

and a TENS unit.  (Tr. 1038.)

A medication list dated April 28, 2004, reveals that Dundr took the following

medications: metoprolol, nifedipine, simvastatin, folic acid, lisinopril, rabeprazole,

spironolactone, multivitamin with minerals, loratadine, rofecoxib, zolpidem, fluoxetine,

tramadol,[11] quetiapine fumarate,[12] divalproex, Endocet,[13] Oxycontin,[14] potassium chloride,

acetaminophen, sildenafil citrate, psyllium oral, albuterol, flunisolide nasal spray, and sodium

chloride.  (Tr. 1036.)

An MRI of the lumbar spine on May 18, 2004 was normal.  (Tr. 768.)

### Hearing Testimony

---

[11]Tramadol is an opioid analgesic indicated for management of moderate to moderately severe pain.  Somnolence is a side-effect of tramadol.  *See* http://rxlist.com/cgi/generic/tramadol_ad.htm (last visited July 25, 2008).

[12]Quetiapine fumarate is an anti-psychotic drug "indicated for the treatment of bibolar disorder, depression, mania, and schizophrenia.  Its possible side effects include sedation and somnolence.  *See* http://rxlist.com/cgi/generic/quetiap_ad.htm (last visited July 25, 2008).

[13]Endocet is the brand name for a combination of oxycodone and acetaminophen. Drowsiness and sedation are two of the most frequently-observed side effects of Endocet. *See* http://rxlist.com/cgi/generic/endocet_ad.htm (last visited July 25, 2008).

[14]Oxycontin is the brand name for oxycodone HCL. *See*, *supra*, p. 9, fn 3.

At the hearing held on April 28, 2004, Dundr testified as follows.  He sleeps 16 hours a day.  (Tr. 515.)  He believes that his medications make him excessively drowsy.  (Tr. 515.)  He has experienced fatigue since 1999.  (Tr. 517-518.)  He has upper back pain and pain under the shoulder blades which travels down his spine.  (Tr. 523.)  He also experiences left knee pain and swelling.  (Tr. 529.)

The medical expert, Dr. Cox testified that the only medication that would make Dundr drowsy is Ambien, a sleeping pill.  (Tr. 553.)  Dr. Cox added that narcotics[15] can also cause some individuals to become drowsy, but that when taken over a long period of time, narcotics do not cause drowsiness.  (*Id.*)

At the supplemental hearing, Dundr again complained of fatigue and reported that the fatigue was due to his medications.  (Tr. 574.)  The medical expert, Dr. Schweid testified as follows.  Dundr's medications, "if used correctly, even cumulatively, . . . would not be disabling."  (Tr. 580, 582-83, 586.)  Dr. Campbell's opinion that the side effects of Dundr's medications caused him to be disabled was "a little bit speculative because [Dr. Schweid did not think there was] a demonstrated side effect problem in [the] record."  (Tr. 586.)  Dr. Schweid opined that Dundr had the mental capacity for routine, low-stress work, by which he meant no arbitration or negotiation, no responsibility for the safety and welfare of others, no confrontations, no intense interpersonal involvement with the public, co-workers, and supervisors, and no high production quotas.  (Tr. 588.)

---

[15]According to the medication lists and doctor's notes cited above, Dundr was consistently prescribed at least one of the following narcotics from February 2002 until at least April 28, 2004, the date on which Dundr's hearing was held: Percocet, Oxycontin, Endocet, and tramadol.

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, which can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

Green was insured on his alleged disability onset date, June 25, 2003 and remained insured through December 31, 2005.  (Tr. 16.)  Therefore, in order to be entitled to DIB, Green must establish a continuous twelve month period of disability between June 25, 2003 and December 31, 2005.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant is entitled to receive SSI benefits under the Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Secretary of Health and Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ made the following findings:

1. Dundr met the disability insured status requirements of the Act on August 12, 1998, the date he stated he became unable to work, and continued to meet them through December 31, 2003.

2. Dundr has not engaged in substantial gainful activity since August 12, 1998.

3. The medical evidence establishes that Dundr has severe impairments of hypertension by history, Conn's syndrome, low back pain, degenerative joint disease of the left knee, adjustment disorder or depression (questionable diagnosis of bipolar disorder), narcissistic, addictive personality disorder, and history of severe polysubstance abuse; but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in appendix 1.

4. Dundr's complaints and symptoms in accord with 20 CFR 404.1529(c) have not been sufficiently corroborated by the objective medical evidence of record.

5. Dundr has the residual functional capacity to perform the physical exertion and nonexertional requirements of work requiring him to lift, carry, push or pull 20 pounds occasionally and 10 pounds frequently and can sit for six to eight hours and stand and walk for six to eight hours in a workday, with normal breaks. Dundr should also avoid hazards in the workplace, including unprotected heights, uneven terrain, or dangerous machinery.  He can occasionally kneel, crouch, stoop, and crawl and occasionally climb ramps and stairs.  He is restricted to simple, routine, low stress work, involving minimal interaction with the public or co-workers.  He should avoid arbitration, negotiation or confrontation or responsibility for the safety and well being of others, and should have low production quotas.

6. Dundr is unable to perform his past relevant work.

7. Dundr's residual functional capacity for the full range of light work is reduced by the additional limitations noted.

8. As of his alleged onset date, Dundr was considered a younger individual; since his 50th birthday on December 22, 2000, he would be considered closely approaching advanced age.

9. Dundr has a high school education.

10. In view of Dundr's age, the issue of transferability of work skills is not material.

11. Based on an exertional capacity for light work, and Dundr's age, education,

and work experience, section 404.1569 and rules 202.21 and 202.14, of appendix 2 would direct a conclusion of "not disabled."

12. Although Dundr's additional nonexertional limitations do not allow him to perform the full range of light work, using the above-cited rules as a framework for decision-making, there are a significant number of jobs in the national economy which he could perform.  Examples of such jobs, which exist in significant numbers in the regional and national economy, are set forth in the body of this decision.

(Tr. 476-477.)

## V. Standard of Review

Because Dundr's request for review has been rejected by the Appeals Council, the decision of the ALJ is the final decision of the Commissioner and is subject to this Court's review.

The Court's review of the Commissioner's decision is limited to determining whether there is "substantial evidence" to support the Commissioner's decision and whether the Commissioner employed proper legal standards in reaching his conclusion.  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  If substantial evidence for the Commissioner's decision exists, the Court's "inquiry must terminate" and the final decision of the Commissioner must be affirmed.  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  If the Commissioner's decision is supported by substantial evidence, the Commissioner's determination must stand regardless of whether the reviewing court would resolve the disputed issues of fact differently.  *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

19

## VI.  Analysis

Dundr presents the following claims: (1) the ALJ erred in failing to give proper consideration to the Plaintiff's complaints of fatigue and, thus, the opinion of his treating physician and (2) the ALJ's determination that the Plaintiff could perform a reduced range of light work activity is not supported by substantial evidence.  (Doc. No. 17, Plaintiff's Brief at 14, 17.)  Each claim is reviewed below.

### A.  Failure to Give Proper Weight to Dundr's Complaints of Fatigue and Opinion of Treating Physician

Dundr's first claim for relief really contains two separate claims.  Dundr contends that the ALJ erred in (1) failing to give proper weight to Dundr's complaints of disabling fatigue and (2) rejecting Dr. Campbell's opinion that Dundr's fatigue was disabling and that Dundr was unemployable.  For the following reasons, the Court rejects both of these claims.

*1. ALJ's credibility assessment with respect to Dundr's complaints of disabling fatigue*

The Court first addresses the argument that the ALJ erred in rejecting Dundr's complaints of disabling fatigue.  Dundr concludes that "[t]he medical evidence demonstrates that Mr. Dundr is disabled due to his symptom of fatigue."  (Doc. No. 17 at 15.)  In doing so, Dundr invokes the wrong standard of review.  Under the proper standard of review, the Court must determine whether substantial evidence in the record supports the ALJ's finding that Dundr was not disabled by fatigue.  It is often the case that substantial evidence in the record supports more than one conclusion.  Nonetheless, if substantial evidence supports the ALJ's finding, the Court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  In this instance, substantial evidence in the record supports the ALJ's finding that Dundr was not disabled by fatigue.

20

The regulations provide that a claimant's symptoms such as fatigue "will not be found to affect [the claimant's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R. § 404.1529.  When an individual alleges disabling symptoms, § 404.1529 requires the ALJ to follow an outlined process for evaluating those symptoms.  First, the ALJ must determine whether objective medical evidence supports the claimant's allegations regarding the disabling effects of the impairment.  *Id.*  If the ALJ finds that the objective medical evidence does not support the claimant's allegations, the ALJ may not simply reject the claimant's statements, but must consider them in light of the entire record.  *Id.*   In assessing the credibility of statements, the ALJ must look to the relevant evidence in the record.  *See* SSR 96-7p.  Beyond the medical evidence, the ALJ should consider seven factors, as they may be relevant to a particular claim.[16]  The ALJ need not analyze all seven factors, but should make clear that he considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.*, 375 F. Supp. 2d 724, 733 (N.D. Ohio 2005).  The credibility determination must contain specific reasons for the finding, "supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for the weight."  SSR 96-7p; *see also Cross*, 375 F. Supp. 2d at 733.

---

[16] The seven factors are: (1) individuals daily activities; (2) location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

In this case, the ALJ followed the procedures outlined by the regulations.  The ALJ concluded that Dundr's "complaints of severe fatigue and sleepiness are not linked to any ongoing medical condition that would preclude him from working if he is compliant with prescribed treatment and is not over-medicated."  (Tr. 475.)  The ALJ further found that "Dundr's complaints and symptoms have not been sufficiently corroborated by the objective medical evidence of record."  (Tr. 477.)  This finding is supported by the record.  The record contains no objective medical evidence that Dundr suffered from disabling fatigue as a result of any of his medical conditions.  The record also contains no objective evidence corroborating the extent of fatigue alleged by Dundr.  Although Dundr was on twenty-one to twenty-two different medications at a time, some of which have the potential to cause side effects of drowsiness, sleepiness, and/or sedation, there is no objective evidence that Dundr actually experienced these side effects to a disabling degree.

While ALJ found that the objective medical evidence did not support the Dundr's allegations, the ALJ was required to, nonetheless, consider Dundr's complaints in light of the entire record and, in doing so, consider the factors set forth above to the extent they were relevant to Dundr's complaints.  The ALJ did so.  The Decision reveals that the ALJ based his credibility finding on the following factors.  First, the ALJ discussed evidence of Dundr's daily activities based on the consultative psychological examination of Dr. Pickholtz in 1999.  As set forth in detail on pages 5-6, *supra*, Dundr kept himself busy every day.  He walked for 40 minutes in the mornings, attended two hours of physical therapy, and drove himself to AA meetings and to the VA every day.  Further, he did his own shopping, cooking and other household chores, and visited his mother and went to church on a regular basis.  Although he

22

complained that he sometimes felt tired, he did not nap every day and when he did nap, he napped for only one hour in the afternoons.  Dundr's daily routine at that time was not at all consistent with someone suffering from the amount of fatigue and sleepiness alleged by Dundr.  The ALJ reasonably relied on Dundr's daily activities in 1999 as evidence that he was not credible because medical records from the VA during that period indicate that he consistently complained of fatigue.  (Tr.  261-62, 267, 277, 314, 378-79.)  The fact that Dundr was complaining of fatigue while carrying on the daily activities set forth above is evidence that detracts from Dundr's credibility.

The ALJ's credibility determination is also supported by evidence from a treating source that Dundr's subjective complaints were not supported by the objective findings.  (Tr. 473.)  The ALJ referred to Dr. Pioro's February 2, 2004 assessment that Dundr's subjective complaints were disproportionate to the objective findings.  After noting Dundr's inconsistent statements with regard to his daily activities, as well as with respect to the efficacy of Percocet in managing his pain, Dr. Pioro indicated, "There is a discrepancy in the record between the patient's numerous subjective complaints and the paucity of objective abnormalities on exam."  (Tr. 701.)  The ALJ further relied on Dr. Schweid's testimony that the discrepancy between subjective complaints and objective findings suggests "somatization or malingering."  (Tr. 473.)

Finally, the ALJ considered evidence that Dundr "exhibited drug seeking behavior and was denied opiate drugs because of his addictive traits, possible overuse, and secondary gain."  (Tr. 473.)  Here, the ALJ refers to Dr. Moss's notes from February 24, 2004 indicating that Dundr "should not be given any opiates for his pain" because (1) Dundr "displayed some addictive traits such as drug seeking behavior and defense of his medication without a clear

indication"; (2) Dundr had "not demonstrated any improvement in function such as returning to work or increasing activity"; (3) Dundr stated that the medication was ineffective; (4) Dundr's pain was "well beyond what would be expected based on the anatomical reasons"; and (5) Dundr has "significant secondary gains from the use of pain medication in that it gives him a reason not to try to return to work or improve his activities (sedation)."  (Tr. 696.)

In addition to evidence of Dundr's daily activities, drug seeking behavior, and treating physician opinions that Dundr's subjective complaints were out of proportion to the objective medical findings, the ALJ further relied on the testimony of the medical examiner, Dr. Schweid. Dr. Schweid testified  that if taken properly, the medications Dundr was taking would not cause disabling fatigue.  (Tr. 473.)

For the reasons discussed above, the ALJ's rejection of Dundr's complaints of disabling fatigue and sleepiness is supported by substantial evidence in the record.  The ALJ's credibility analysis is "sufficiently specific to make clear" the weight the ALJ gave to Dundr's allegations of disabling fatigue and the reasons for that weight.  Accordingly, Dundr's claim that the ALJ erred in rejecting his complaints of disabling fatigue is denied.

### 2.  ALJ's Failure to Give Reasons For Rejecting Treating Physician's Opinion

Dundr further contends that the ALJ failed to provide sufficient reasons for rejecting Dr. Campbell's opinion that Dundr was disabled and unemployable due to the side effects of his medications.  According to Dundr, the only reason the ALJ offered for rejecting Dr. Campbell's opinion was that he relied on Dr. Schweid's testimony that the medications Dundr was taking should not cause an individual to become disabled.  Dundr argues that this was error because the opinions of treating physicians should generally be given greater weight than those of physicians

24

hired by the Commissioner.

Dundr is correct that generally, the opinions of treating physicians should be accorded greater weight than the opinions of physicians hired by the Commissioner. 20 C.F.R. § 404.1527(d)(2) ("Generally, we give more weight to opinions of your treating sources. . . ."); *Lashley v. Secretary of Health and Human Servs.*, 708 F.2d 1048 (6th Cir. 1983). Moreover, the ALJ must give controlling weight to the medical opinion of a treating physician when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the record. § 404.1527(d)(2).

However, the regulations further provide that medical source opinions on some issues, such as a claimant's RFC, whether a claimant meets a listed impairment in the Listing of Impairments, or whether a claimant is "disabled" or "unable to work" are not medical opinions, "but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." § 404.1527(e)(1). No special significance is given to the source of an opinion on issues reserved to the Commissioner. § 404.1527(e)(3). Although the Commissioner considers medical source opinions on these issues, the final responsibility for deciding these issues is reserved to the Commissioner. § 404.1527(e)(2).

Dr. Campbell's opinion that Dundr was disabled due to the side effects of his medications is *not* a medical opinion, but an opinion on an issue reserved to the Commissioner. As such, it is entitled to no special significance. Moreover, in compliance with §404.1527(d)(2) ("We will always give good reasons . . . for the weight we give your treating source's opinion."), the ALJ gave good reasons for the little weight he accorded Dr. Campbell's opinion. The ALJ noted that

Dr. Campbell's opinion was contrary to the opinion of Dr. Schweid.  (Tr. 473.)  In addition, the ALJ's credibility analysis with respect to Dundr's complaints is relevant to and also supports the ALJ's rejection of Dr. Campbell's opinion because Dr. Campbell's opinion was not based on any identified objective findings.  Thus, the ALJ provided good reasons for rejecting Dr. Campbell's opinion that Dundr was disabled.

For the reasons discussed above, Dundr's claim with respect to the ALJ's rejection of his treating physician's opinion is denied.

## B.  ALJ's Determination That Dundr Could Perform Reduced Range of Light Work

Dundr challenges the ALJ's finding that Dundr had the RFC to perform light work[17] reduced by the following additional limitations: Dundr could perform no work involving hazards in the workplace, including unprotected heights, uneven terrain, or dangerous machinery; only occasional kneeling, crouching, stooping, crawling, and climbing of ramps and stairs; only simple, routine, low-stress work involving minimal interaction with the public and co-workers; and no work which involves arbitration, negotiation or confrontation or responsibility for the

_____

[17]Light work is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

26

safety and well-being of others, and; work with only low production quotas.  (Tr. 477.)  Based on this RFC and the vocational factors, the ALJ found that Dundr was not disabled because he could perform jobs that exist in significant numbers in the national economy.  (Tr. 477.)

Dundr contends that the medical evidence in the record demonstrates that he can perform only sedentary work.[18]  In doing so, he invokes the wrong standard of review.  The question before this Court is whether  the ALJ's finding that Dundr can perform light work is supported by substantial evidence.  In social security cases, the evidence often supports more than one conclusion.  Even if the Court would decide a disputed issue differently, the ALJ's decision must be affirmed as long as substantial evidence – *i.e.*, more than a scintilla, but less than a preponderance of evidence– supports the decision and the ALJ reached the decision using the proper standards under the regulations.  *See supra* Section V.

In reaching his RFC finding, the ALJ began with the RFC finding of the previous administrative law judge, ALJ Washington, that Dundr could perform light work, as Dundr did not challenge that finding on appeal.  The ALJ noted:

> Dundr was previously found to be capable of a wide range of light work by the prior administrative law judge in his decision of March 28, 2001.  In its order of

---

[18]Sedentary work is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a.).

> remand, the United States magistrate judge noted that Dundr's residual functional
> capacity at the light work level 'is not challenged.' (Ex.4A, p. 8.)  He also
> commented that to be found disabled, he would have to show that either fatigue or
> his mental impairments rendered him disabled, which the court "quite frankly, . . .
> has misgivings as to whether he can do so."

(Tr. 474.)  The ALJ then stated that there was no new medical evidence – evidence derived after

ALJ Washington's RFC finding – that persuaded him that Dundr suffered a further reduction in

his RFC for physical work.  (*Id*.)

The ALJ considered Dr. Elbadawy's April 27, 2004 medical source statement, but found

it unpersuasive.  Dr. Elbadawy opined that Dundr could lift 10 pounds both frequently and

occasionally, could stand 4 hours total in an 8 hour day and only 2 hours at a time, and had other

non-exertional limitations.  (Tr. 474.)  While  Dr. Elbadawy attributed these limitations to

chronic back pain and osteoarthritis, he failed to cite any "clinical findings" or "diagnostic

studies."  (*Id*.)  As the opinion was not based on any objective findings and was inconsistent with

the opinion of Dr. Cox, the medical expert, the ALJ reasonably rejected Dr. Elbawady's

opinion.[19]

Dundr argues, incorrectly, that because Dr. Elbadawy was a treating source, his opinion

as to Dundr's RFC was entitled to greater weight than the opinions of non-treating physicians or

medical experts.  As previously discussed in Part VI.A.2., opinions with respect to a claimant's

RFC are not medical opinions, but are opinions on issues reserved to the Commissioner.  As

---

[19]Dr. Cox "opined that Dundr could sit, stand, and walk six out of eight hours in a work
day, lift 30 pounds occasionally and 20 pounds frequently, should avoid hazards, and can
occasionally climb, stoop, crouch, or crawl."  (Tr. 475.)  "[E]ven though Dr. Cox's
opinion is compatible with a level of work ranging between medium and light in
exertional capacity, the ALJ restricted Dundr to light work "in view of the court's
statement that [an RFC for light work] was not challenged."  (*Id.*)

such, the source of those opinions are not entitled to any special significance.  § 404.1527(e)(1)-

(3).

The ALJ finally noted that consistent with the opinion of both medical experts, "the

medical reports do not corroborate Dundr's subjective complaints."  (*Id.*)  The ALJ cited the

following medical evidence in support of this conclusion:

> X-rays of Dundr's left knee have consistently failed to show [sic] only minimal
> degenerative changes.  X-rays of Dundr's lumbar spine have been normal, and an
> MRI taken in March 1999 showed only mild degenerative disc disease with no
> significant stenosis.  Dundr reported to his kinesiotherapist in April 1999 that he
> was experiencing only occasional knee pain, when he twisted his knee.  In June
> 1999, Dundr reported to the therapist that his knees ached once in a while, and
> that his back was still sore.  The medical reports show that Dundr's hypertension
> is well controlled with medication.  In addition, Dundr's treating physician, Dr.
> Falconi, told Dundr in April 1999 that he was not disabled, and that he needed to
> work.  A CT scan in December 2001 showed a herniated disc at L4-5, but clinical
> findings do not establish any nerve root compromise, and surgery has not been
> performed.  Dundr's complaints of severe fatigue and sleepiness are not linked to
> any ongoing medical condition that would preclude him from working if he is
> compliant with prescribed treatment and is not over-medicated.

(Tr. 474-75.)  This evidence constitutes substantial evidence that Dundr's subjective complaints

with respect to his limitations were not corroborated by the objective medical evidence.

The ALJ's finding that Dundr had not become further limited, in terms of his physical

exertional capacity, since the previous hearing is supported by substantial evidence.

Accordingly, Dundr's challenge to the finding that he had the RFC to perform a reduced range of

light work is denied.

### VII.  CONCLUSION

For the foregoing reasons, the final decision of the Commissioner is **AFFIRMED**.

/s/ Nancy A. Vecchiarelli

DATE: July 29, 2008                     United States Magistrate Judge

29